In re AVALON HOTEL PARTNERS, LLC, Debtor and Debtor–in–Possession.

No. 303–40414–rld11.

United States Bankruptcy Court, D. Oregon.

Oct. 30, 2003.

Mary Jo Heston, Catherine S. Travis, Portland, OR, for Debtor.

John G. Crawford, Jr., Portland, OR, for Creditor.

## MEMORANDUM OPINION

RANDALL L. DUNN, Bankruptcy Judge.

This chapter 11 case is before me on Avalon Hotel Developer, LLC's ("AHD") Motion to Dismiss. AHD is a member of the Debtor, Avalon Hotel Partners, LLC ("AHP"). This is a core proceeding over which this court has jurisdiction under 28 U.S.C. Sections 1334 and 157 and District Court of Oregon Local Rule 2100–1.

Following the hearings held in this case on September 30 and October 2 and 8, 2003, I have reviewed my notes from the hearings, the admitted exhibits and relevant legal authorities. The findings that I set forth in this Memorandum Opinion are designated as the court's findings under Fed.R.Civ.P. 52(a), applicable with respect to this contested matter under Fed. R. Bankr.P. 9014.[1]

1. This Memorandum Opinion supersedes the court's tentative oral ruling, stated in a hearing on October 10, 2003.

## Factual Background

On September 15, 2003, at 2:47 p.m., while its litigation counsel was busy defending its position vigorously in a hearing in the Multnomah County Circuit Court ("State Court"), AHP filed a voluntary chapter 11 petition ("Petition"), and instantly changed the battlefield upon which the legal skirmishes between some of the members of AHP were being fought.

The sole asset of AHP is the upscale Avalon Hotel[2], a 100–room hotel located on the shores of the Willamette River near downtown Portland. Paul Brenneke ("Mr. Brenneke"), through one of his business entities, purchased the land for development of the Avalon Hotel in 1994. The project approval process, initiated in 1996, extended through 27 public hearings. AHP was formed in January 2000 for the purpose of owning the Avalon Hotel property, developing the hotel complex and operating the hotel, and leasing all retail space located on the property.

The hotel developer, AHD, principals of which are Mr. Brenneke and Terrence Bean ("Mr. Bean"), retained a 23.50% ownership interest in AHP. Several related entities, referred to by the parties as the Pacific Western Entities, own an aggregate 67.19% interest in AHP. In addition to AHD and the Pacific Western Entities, there are two further minority members of AHP: Portland Avalon Hotel, LLC ("PAH"), with a 7.99% ownership interest, and Edward R. Dundon, with a 1.32% ownership interest.

At the time the Petition was filed, AHP owed approximately $7,700,000 to CorUS Bank ("CorUS"), secured by a first mortgage on the hotel, and approximately $2,500,000 to Dynamic Finance ("Dynamic"), secured by a second mortgage on the hotel. Payment of both the CorUS loan and the Dynamic loan is guaranteed personally by Mr. Brenneke and Mr. Bean. In addition, AHD borrowed $1,000,000 each from DHIJ Management Company ("DHIJ") and Casa La Veta Associates ("Casa La Veta"). The funds from these loans were used as capital contributions to AHP. Through an amendment to AHP's Operating Agreement (the "Operating Agreement"), approved by all members of AHP in March 2001 (the "March 2001 Amendment"), AHP agreed to make periodic payments to AHD in the amount of $23,333.34 to fund AHD's payment obligations on the DHIJ and Casa La Veta loans. AHP made consistent payments to AHD on the DHIJ and Casa La Veta loans until approximately June 2002. Thereafter, AHP made only sporadic payments.

Under the Operating Agreement, Mr. Brenneke initially was the manager of AHP. During mid– to late 2002, Mr. Brenneke attempted to make cash calls to the AHP members to fund the DHIJ and Casa La Veta loan payments. During this time, relationships among the AHP members deteriorated. In January 2003, Pacific Western Management, LLC ("PWM"), a non-member entity affiliated with the Pacific Western Entities, took over management of AHP. Mr. Brenneke and AHD disputed the authority of the Pacific Western Entities to make the management change under the Operating Agreement. In retaliation, AHD dissolved AHP and invoked the auction buy-out provisions of the Operating Agreement. AHD then initiated litigation against AHP and PWM in the State Court (the "State Court Litigation") in order to enforce its auction rights. None of the Pacific Western Entities, other than PWM, and neither PAH nor Mr.

**2.** The property also consists of restaurant space and a spa, and the upper floors are designated for development of seven luxury condominiums.

Dundon were made parties to the State Court Litigation.

The auction was conducted pursuant to an order of the State Court on September 3, 2003. AHD was the successful bidder. Closing was to occur initially on September 8, 2003, but documentation issues and controversies relating to the scope of releases extended closing until September 12, 2003. On September 12, 2003, the judge in the State Court Litigation further extended the closing until September 15, 2003, only after soliciting and receiving assurances that AHP would not file a bankruptcy petition prior to 5:00 p.m., on September 15, 2003.

The Resolution authorizing the filing of the Petition was signed in behalf of PWM, the manager of AHP. Two days after the Petition was filed, AHD filed a motion to dismiss ("Motion to Dismiss") on the bases that PWM lacked authority to file the Petition on behalf of AHP; the doctrine of judicial estoppel operates to prohibit AHP from filing the Petition; the Petition was filed in bad faith; and this court should abstain in the circumstances of this case. AHD requested an expedited hearing on its Motion to Dismiss. Subsequent to the filing of the Motion to Dismiss, the Pacific Western Entities and PAH, representing more than 75% of the member ownership interests in AHP, executed a consent resolution to ratify the filing of the Petition.

*Legal Discussion*

1. *Was AHP's bankruptcy filing properly authorized?*

   A. *Manager Resolution*

   Voluntary bankruptcy cases are commenced pursuant to Section 301 of the Bankruptcy Code.[3] However, whether a business entity properly is authorized to file a bankruptcy petition is a matter determined under state law. *See, e.g.,* 2 *Collier on Bankruptcy,* ¶ 301.04[7][a], [b] and [c] at 301–11–12 (15th Ed. Revised 2003).

AHP is an Oregon limited liability company ("LLC"). LLCs are hybrid business entities, with attributes both of corporations and partnerships. They provide their equity holders or "members" with the liability shield of corporations while giving them the benefit of partnership tax treatment. *See* Blakemore, "Limited Liability Companies and the Bankruptcy Code: A Technical Review," 13 *Am. Bankr.Inst. J.* 12 (1994). Oregon LLCs are governed by the provisions of Oregon Revised Statutes ("ORS") Chapter 63 and by the terms of their organizational documents, their Articles of Organization and Operating Agreements.

■ This case was commenced following the adoption of a resolution by AHP's manager, PWM, signed by its Assistant Manager, authorizing the filing of a chapter 11 petition, without member approval. Under the Operating Agreement, "Major Decisions" require the approval of members holding "in excess of 75% of the Ownership Interests." Ex. 1, p. 23. Although the specific list of Major Decision items included in Section 9.7 of the Operating Agreement does not include bankruptcy filings, the list is nonexclusive. Ex. 1, pp. 23–24. A decision to file for bankruptcy protection is a decision outside of the ordinary course of business, even for an entity in dissolution.

Under ORS 63.130(4)(f), a decision to convert an LLC into any other type of entity requires the consent of a majority of

---

**3.** Unless otherwise indicated, all section references are to the Bankruptcy Code, 11 U.S.C. Sections 101–1330.

the members. By filing a chapter 11 petition, AHP was converted into a debtor-in-possession, charged with the fiduciary responsibilities of a trustee in bankruptcy under Section 1107(a).

I find that the filing of a bankruptcy petition by AHP's manager without member approval is not authorized either by Oregon law or the Operating Agreement. Accordingly, if the filing of this case was supported only by the initial authorizing resolution of the manager, I would grant AHD's Motion to Dismiss.

### B. *Ratification by Consent Resolution*

■ However, AHP's bankruptcy filing subsequently was authorized by a consent resolution (the "Consent Resolution") approved by in excess of 75% of the members by ownership interest. *See* Ex. B. Pursuant to Section 9.9 of the original Operating Agreement, consent resolutions had to be approved by all of the members in order to be effective. *See* Ex. 1, p. 24. Section 20.1 of the Operating Agreement, however, allows the Operating Agreement to be amended by the written consent of 75% of the members. *See* Ex. 1, p. 37. I find that Section 9.9 of the Operating Agreement was so amended in the December 2002/January 2003 time period to operate prospectively to authorize LLC action by consent resolutions approved by the appropriate percentage of the members required for such action under the Operating Agreement. *See* Ex. 1, pp. 1, 3–6.

■ I find that the decision to file for protection under chapter 11 of the Bankruptcy Code is a Major Decision for purposes of Section 9.7 of the Operating Agreement, requiring the approval of in excess of 75% of the members. *See* Ex. 1, p. 23. Where an Oregon LLC is in dissolution, as is AHP, ORS 63.629(2) authorizes ratification after the fact of LLC decisions that otherwise "would not be

binding." Such ratification to approve a bankruptcy filing is not inconsistent with the requirements of the Bankruptcy Code. *See, e.g., Hager v. Gibson*, 108 F.3d 35, 39–40 (4th Cir.1997); *Boyce v. Chemical Plastics, Inc.*, 175 F.2d 839, 842–44 (8th Cir.), *cert. denied*, 338 U.S. 828, 70 S.Ct. 77, 94 L.Ed. 503 (1949); and *In re Dearborn Process Service, Inc.*, 149 B.R. 872, 878–79 (Bankr.N.D.Ill.1993). *Contra In re Zaragosa Properties, Inc.*, 156 B.R. 310, 313 (Bankr.M.D.Fla.1993).

The Consent Resolution was approved by in excess of 75% by ownership interest of the members of AHP within ten days following the date of AHP's bankruptcy filing. *See* Ex. B. I find that AHP's bankruptcy filing was properly authorized by AHP's members.

### C. *Loss of Voting Rights*

■ AHD argues that the Consent Resolution cannot be effective because the members who approved it automatically had lost their LLC voting rights as a result of their respective failures to make additional capital contributions pursuant to Section 6.3.1 of the Operating Agreement, as required under Section 8 of the March 2001 Amendment. *See* Ex. 1, pp. 7–12. The subparts of Section 6.3 of the Operating Agreement, dealing with provisions for further capital contributions of the members, are very complex. *See* Ex. 1, pp. 17–19. Section 6.3.2 of the Operating Agreement sets forth a detailed procedure, in the absence of member agreement, for individual AHP members to call for additional capital contributions. Such calls require a "Call Notice," which

> shall contain (i) a statement of the additional capital required, (ii) a reasonably detailed breakdown of the expenditures for which such funds will be used, and (iii) the Contribution Date, which shall

not be sooner than 14 days after the notice is given.

In the event that the special capital contributions requested in such a Call Notice are not made in full by the Contribution Date, and within 60 days thereafter, the voting rights of non-contributing members are suspended pursuant to Section 6.3.3.2 of the Operating Agreement. *See* Ex. 1, p. 19. Likewise, members who do not make their agreed capital contributions pursuant to Section 6.3.1 of the Operating Agreement within such 60 day period lose their LLC voting rights under Section 6.3.3.2. However, the timing of such loss of voting rights again is tied to not making agreed capital contributions "60 days after the Contribution Date."

I agree with AHD that all members agreed in the March 2001 Amendment to make capital contributions to the Excess Capital of AHP so that AHP could make guaranteed payments, as due, to AHD. However, even though AHD's representatives, Mr. Brenneke and Mr. Gifford, both testified that numerous telephone calls, e-mails and written demands were made in behalf of AHD for contributions from other members to fund the capital contributions required under Section 8 of the March 2001 Amendment, there is no evidence in the record establishing that written notice setting a specific Contribution Date(s) for such capital contributions ever was sent.

AHD's position is that the other members' failures to fund such required capital contributions automatically resulted in the termination of their LLC voting rights as early as late August or early September 2002. Yet, the record is replete with references thereafter, including communications from AHD's counsel, acting at times as counsel for AHP as well, to the continuing voting rights of the members. *See, e.g.,* Ex. R, p. 2; Ex. W, pp. 2–4; Ex. Z,

pp. 1–2; Ex. 34, p. 2; Ex. 38, p. 2; and Ex. 40, pp. 2–3. Indeed, as late as September 11, 2003, Ms. Xu, counsel for Mr. Bean, a principal of AHD, e-mailed the judge in the State Court Litigation, advising her that Mr. Brenneke, also a principal of AHD, was "seriously considering activating" Section 18.3.4 of the Operating Agreement, which eliminates the right of a "non-contributing member" to vote on LLC matters. *See* Ex. 18, pp. 4–5.

Losing the right to vote on LLC governance issues is such a draconian penalty to impose on LLC members that its imposition must be based on the application of clear standards, with adequate notice. In the situation presented by this case, (1) there is no evidence that notice was given of a Contribution Date(s) for the required agreed contributions to Excess Capital that allegedly have been missed, and (2) required capital contribution issues are so confused and contentious that at multiple points in time subsequent to the period when AHD argues other members automatically lost their LLC voting rights, documents in evidence establish that AHD's own representatives assumed that the other members retained their voting rights. In these circumstances, I find that the members of AHP did not lose their voting rights on LLC governance issues and retained those rights when the Consent Resolution was adopted. I reject the argument that the members who approved the Consent Resolution had no authority to do so.

## 2. *Judicial Estoppel*

■ AHD argues that judicial estoppel should apply, and its Motion to Dismiss should be granted because AHP and its manager obtained an extension of the closing of the auction sale of AHP's hotel assets from the judge in the State Court Litigation by representing that no bank-

ruptcy case would be commenced in behalf of AHP before 5:00 p.m. on September 15, 2003. Then, the manager of AHP proceeded to file the Petition in AHP's name on September 15, 2003, at 2:47 p.m., while the AHP manager's counsel allegedly extended argument before the State Court judge concerning the terms of the auction sale closing order beyond the time that the Petition was filed.

■ The principle of judicial estoppel seeks to prevent a party from obtaining unfair advantage by asserting inconsistent positions either in the same or different legal proceedings.

> The doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process. *See* 1B *Moore's Federal Practice* Paragraph .405[8], at 238–42 (2d Ed.1988). "The policies underlying preclusion of inconsistent positions are 'general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings.' " *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1215 (9th Cir.1984), *cert. denied*, 469 U.S. 1197, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985) (citations omitted). Judicial estoppel is "intended to protect against a litigant playing 'fast and loose with the courts.' " *Rockwell International Corp. v. Hanford Atomic Metal Trades Council*, 851 F.2d 1208, 1210 (9th Cir.1988) (citations omitted). Because it is intended to protect the integrity of the judicial process, it is an equitable doctrine invoked by a court at its discretion. *Religious Tech. Ctr., Ch. of Scientology v. Scott*, 869 F.2d 1306, 1311 (9th Cir.1989) (Hall J., Dissenting).

I am not sure that AHP's bankruptcy filing represents an "inconsistent position" from the representations of its manager's counsel to the State Court judge that no bankruptcy case would be filed in behalf of AHP prior to 5:00 p.m., on September 15th, although I certainly understand AHD's vehement argument that AHP and its manager played "fast and loose" with the judge in the State Court Litigation. However, I have a greater policy concern.

Applying judicial estoppel to grant AHD's Motion to Dismiss and in effect to preclude AHP from filing for bankruptcy protection would be analogous to upholding a covenant not to file bankruptcy. Courts appear universally to find such covenants unenforceable. *See, e.g., In re Cole*, 226 B.R. 647, 651–52 (9th Cir. BAP 1998) and cases cited in n. 7 therein. As a matter of public policy, it is not appropriate to enforce judicial estoppel where the impact would fall not just on the alleged offending parties, arguably AHP and its manager, but also on parties to which a chapter 11 debtor in possession owes fiduciary duties, including minority members who are not parties to the State Court Litigation, such as PAH and Edward R. Dundon, and creditors in this case. Accordingly, I find that judicial estoppel does not provide an appropriate basis for granting the Motion to Dismiss in the circumstances of this case.

### 3. *Bad Faith/Good Faith*

■ The conduct in the State Court Litigation of which AHD complains is more appropriately dealt with as a basis for granting a motion to dismiss under Section 1112(b) of the Bankruptcy Code "for cause," in light of the alleged "bad faith" of AHP.

> Although section 1112(b) does not explicitly require that cases be filed in "good faith," courts have overwhelmingly held

that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal. *In re Marsch,* 36 F.3d 825, 828 (9th Cir.1994) and cases cited therein.

AHD argues that AHP's bankruptcy case should be dismissed because of AHP's bad faith in filing the Petition during the day on September 15, 2003, after counsel for AHP and its manager had advised the court in the State Court Litigation that no such filing would be made before 5:00 p.m. that day. AHD further argues that the timing of AHP's bankruptcy filing was strategic in order to preempt or preclude the state court's order allowing the auction purchase of AHP's hotel assets to close. *See* Ex. 20.

■ The moving party has the initial burden of making a prima facie case to support its allegations of bad faith. Once such a showing has been made, the burden shifts to the debtor to establish that its chapter 11 case was filed in good faith. *See, e.g., In re Walden Ridge Development, LLC,* 292 B.R. 58, 62 (Bankr.D.N.J. 2003). I find that AHD has presented a prima facie case of bad faith on the part of AHP and its manager.

Certainly, the circumstances and timing of AHP's chapter 11 filing evidence some manipulation of proceedings with respect to the State Court Litigation. Mr. Walls, the Manager of PWM, admitted in his testimony that the primary motivation for the bankruptcy filing was to protect the interests of the Pacific Western Entities. However, this case involves more than a simple two party dispute. Mr. Walls also testified credibly that he had to act to file bankruptcy in order to protect the interests of creditors, by maximizing value for all of the creditors, who were not being protected in the State Court Litigation. Mr. Fujikawa, a principal of PAH, a minority member that was not a party to the State Court Litigation, but whose support was crucial to securing the requisite ownership percentage approvals for the Consent Resolution, testified that he ratified the decision to file AHP's bankruptcy, even though he was unaware of the bankruptcy prior to its actual filing. I find that Mr. Fujikawa's decision to support the Consent Resolution was made in good faith.

■ The decision as to whether to dismiss a bankruptcy case as a "bad faith" filing is committed to the discretion of the bankruptcy court. *See, e.g., In re St. Paul Self Storage Limited Partnership,* 185 B.R. 580, 582 (9th Cir.BAP1995); *In re Erkins,* 253 B.R. 470, 474 (Bankr.D.Idaho 2000).

In light of the foregoing evidence, I find that AHP has met its burden of proof to establish that its chapter 11 case was filed in good faith and should not be dismissed for cause.

### 4. *Abstention*

■ Finally, AHD requests that this court abstain from this case pursuant to Section 305(a)(1) of the Bankruptcy Code because the interests of creditors and AHP would be best served by a dismissal. AHD argues that this case is primarily a "two party dispute" that would be better handled in State Court. After hearing the evidence, I disagree.

To date, the State Court Litigation has dealt primarily with control issues between some members of AHP, without dealing effectively with the underlying financial problems of the Avalon Hotel. The high bid for the Avalon Hotel property through the State Court Litigation auction process was $10,600,000, an amount substantially less than the obligations of AHP to creditors, as admitted both by AHP and AHD. *See* Exs. 30 and C. Creditor claims are

going unpaid while new "capital call" litigation may have to be initiated to sort out disputes that have been simmering unresolved among the AHP members for more than a year. Chapter 11 may provide a useful breathing space and mechanism for the efficient resolution of creditor claims and possibly, member claims as well. In these circumstances, I do not find it appropriate as a discretionary matter to abstain.

### Conclusion

Based on the foregoing findings of fact and conclusions of law, I will deny AHD's Motion to Dismiss. The court will prepare and enter the Order.